42 A.3d 1002

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**John D. AU, Appellee.**

Supreme Court of Pennsylvania.

Argued April 12, 2011.

Decided April 26, 2012.

Michael T. Madeira, State College, Stacy Parks Miller, Yvette Louise Willson, Centre County District Attorney's Office, for Commonwealth of Pennsylvania.

Joseph L. Amendola, Amendola & Associates, State College, for John D. Au.

David R. Crowley, Bellefonte, for Appellee Amicus Curiae, PA Association of Criminal Defense Lawyers.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice SAYLOR.*

Appeal was allowed to review the Superior Court's conclusion that a police-citizen encounter ripened into an investigative detention when an officer requested identification from vehicle occupants.

In May 2007, Appellee was arrested by a Ferguson Township police officer and charged with possession of a small amount of marijuana. *See* 35 P.S. § 780–113(a)(31)(i). Appellee sought suppression and a hearing ensued.

The arresting officer testified that, while on routine patrol in the early morning hours, his attention was drawn to an automobile parked in the lot of a business premises. According to the officer's testimony, it was unusual to see a car in the location at such time, and he decided to make further inquiry. The officer did not activate the emergency lights of his police cruiser, but he positioned his vehicle at an angle relative to the parked automobile so as to illuminate the passenger side. The

* This matter was reassigned to this author.

officer said that he did so without blocking the egress of the vehicle, which he then approached, probably with a flashlight. Further, he explained:

As I walk up the passenger rolled down the window. I walked up and just stated what's going on and they stated that they were hanging out. I noticed that there were six individuals in the vehicle, four in the back seat and two in the front-seat. The individuals all looked very young to me, especially those in the back. So I asked if everyone was 18 and the individuals in the back said no.

\* \* \*

Now, at this point I asked the passenger for his identification. He opened the glove box, which was seated right in front of him. When he did there was two baggies of which were clearly marijuana in the glove box direct-in his immediate control. I kept talking to him, requested another officer to come out because of the illegal drugs. I went over to the driver's side opened up the door and asked for his identification as well. When I did that there was also drugs on that side of the vehicle.

N.T., Oct. 4, 2007, at 5–6. In his testimony, the officer identified Appellee as the front-seat passenger.

The common pleas court awarded suppression of the drug evidence. The court framed the issue as whether the arresting officer had the legal authority to approach the parked vehicle and ask for identification from the occupants when there was no evidence of any criminal activity or a violation of the Motor Vehicle Code. *See generally Commonwealth v. Strickler*, 563 Pa. 47, 58, 757 A.2d 884, 889 (2000) ("To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion[.]"). On its review, the court found such authority to be lacking. *See Commonwealth v. Au*, No. CP–14–CR–1363–2007, slip op. at 6, 2007 WL 7275630 (C.P.Centre, Oct. 30, 2007) ("The Court finds that the interaction with [the arrest-

ing officer] was, from its inception, an investigative detention.").

Initially, the suppression court discussed the boundary between the two relevant types of police-citizen interactions—namely, a mere encounter and an investigative detention—defined by whether a seizure of the person has occurred. *See generally Strickler*, 563 Pa. at 57–58, 757 A.2d at 889. The court explained that the seminal inquiry turns on whether, considering the totality of the circumstances, a reasonable person would believe he was free to leave. *Accord id.* (explaining that, "[i]n evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained" (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality))).[1]

The suppression court then indicated that its decision was controlled by *Commonwealth v. Mulholland*, 794 A.2d 398 (Pa.Super.2002) (holding that police had undertaken an investigative detention upon confronting an occupant of a parked van). Notably, however, whereas the court recognized that *Mulholland* concerned a situation in which a police officer had positioned his own vehicle so as to make it difficult or impossible for the vehicle under investigation to depart, the court did not reconcile this with the evidence—reflected in the arresting officer's testimony in Appellee's case—that the officer had not impeded the egress of the parked vehicle in which Appellee was a passenger.

On appeal, a three-judge panel of the Superior Court initially affirmed, and that result was sustained by an *en banc* panel

---

1. The United States Supreme Court has further explained that the reasonable person test "presupposes an *innocent* person." *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991) (emphasis in original).

This litmus also has been refined to account for circumstances in which a citizen may not wish to leave, or in which leaving may be impractical as an option for reasons other than police presence. *See, e.g., id.* at 436, 111 S.Ct. at 2387. In such circumstances, the appropriate inquiry is whether a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter. *See id.*

of the Superior Court in a deeply divided opinion on reargument. *See Commonwealth v. Au*, 986 A.2d 864 (Pa.Super.2009) (*en banc*). At the outset, the majority differed with the suppression court's conclusion that the encounter between the arresting officer and Appellee was an investigatory detention from the beginning. *See id.* at 867 ("[T]he law clearly recognizes that when an officer approaches a citizen and talks to that citizen without any assertion of authority, then what has transpired is a mere encounter.") (citing *Commonwealth v. Ellis*, 541 Pa. 285, 293–94, 662 A.2d 1043, 1047 (1995)). According to the majority, however, the interaction "ripened into an investigative detention" when the officer requested information from the vehicle occupants. *Id.* at 867. The majority emphasized that the cruiser headlamps where shined directly into the parked vehicle, and the officer, in full uniform, apparently was unsatisfied with the occupants' response to his initial inquiry. From the majority's point of view:

> In such a situation, no person would have felt free to terminate the encounter and depart the scene; particularly Appellee, who sat there with the headlights of a police car shining into his face. While a person in Appellee's situation may have surmised that the officer initiated the encounter to merely check upon the vehicle and its occupants, the subsequent request for identification from all of the vehicle's occupants would have signaled to any reasonable person that the officer was unsatisfied with the response that the occupants were just hanging out, and that the officer wanted to investigate further. Knowing that the officer sought to investigate further and that this was no longer a situation where the officer was just checking in to see if the occupants were in need of assistance, no reasonable person would have felt free to terminate the encounter. *See Commonwealth v. DeHart*, 745 A.2d 633, 639 (Pa.Super.2000) (holding that an investigative detention occurred when the officer, after an initial inquiry, exited the vehicle and approached its occupants because the officer "chose to escalate the encounter to afford greater investigation, which, of

course, is consistent with the purpose of an investigative detention").

*Au,* 986 A.2d at 867–68.

Judge Shogan authored the dissent and was joined by three other judges. In its discussion, the dissent highlighted the following passage from the decision of the United States Supreme Court in *Hiibel v. Sixth Judicial District of Nevada,* 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004):

Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."

*Id.* at 185, 124 S.Ct. at 2458 (quoting *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)). Additionally, the dissent reviewed a series of Pennsylvania decisions applying Fourth Amendment precepts and concluding that police inquiries and requests for identification, even in constrained locations, do not necessarily reach beyond the level of a mere encounter. *See, e.g., Commonwealth v. Smith,* 575 Pa. 203, 217–18, 836 A.2d 5, 13–14 (2003) (holding that an interaction in which law enforcement officers boarded a passenger bus upon a scheduled terminal stop; upon reaching the appellant's seat, requested to view her identification and ticket; and asked questions regarding her destination and luggage, did not amount to a seizure); *Commonwealth v. Dowds,* 563 Pa. 377, 387, 761 A.2d 1125, 1130 (2000) (concluding the appellant was not seized under the Fourth Amendment when initially approached by law enforcement officers in an airport, who were in plain clothes, did not display weapons, identified themselves, explained their duties at the airport, and requested ticket and identification information).

According to the dissent:

[T]he request to see identification was not an intrusion of Appellee's privacy. Rather, it is the type of question permitted during a mere encounter, which is itself a request for

information that needs no level of suspicion. In addition, of significant importance is the testimony which clearly indicates [the officer] parked his cruiser in a manner which permitted the parked vehicle to exit the parking lot at any time. Thus, there was not restraint on the movement of Appellee or the vehicle by the conduct of the officer or the placement of the police cruiser. Consequently, in analyzing the factors surrounding the interaction, none of the conditions which would indicate that a seizure occurred were present.

*Au,* 986 A.2d at 872–73 (Shogan, J., dissenting).

Presently, the Commonwealth maintains that, at the time the arresting officer observed baggies of marijuana in the glove box, his interaction with the vehicle occupants remained nothing more than a mere encounter. The Commonwealth relies primarily on the line of cases invoked in the Superior Court dissent. In addition, the Commonwealth discusses a series of social policy considerations, as follows:

[S]ociety expects police officers to keep the peace, and to aid stranded motorists. The owners of businesses ... would not want the police to simply ignore nocturnal activity in their parking lots after hours. And, motorists often require assistance late at night. Requiring officers to have reasonable suspicion before requesting identification from individuals while performing these salutary duties is too onerous. There is no legitimate purpose to be gained by such a rule. ... In the instant case, [the officer] was trying to balance his own safety interests with that of the [Appellee] and the passengers of the vehicle. He did not use any unreasonable or excessive means to achieve this balance. He used his regular headlights, walked up to the vehicle, and asked what's going on. When the occupants indicated there were juveniles in the vehicle out late at night, he simply asked for identification.

Brief for Appellant at 12–13 (citation omitted); *see also id.* at 9 ("This scenario ... presents an extremely important public policy safety issue for police officers who work late at night, often by themselves, and approach vehicles with unknown

occupants inside."); *id.* at 12 ("[P]articularly late at night, at a closed business ... an officer must be permitted to know with whom s/he is dealing.").

Appellee, like the suppression court, places substantial emphasis on the *Mulholland* decision in urging that the interaction was an investigative detention from the outset. He also offers an argument in the alternative which tracks the analysis of the Superior Court majority in contending that the encounter ripened into a seizure scenario upon the arresting officer's request for identification. *Accord* Brief for *Amicus* Pa. Ass'n of Criminal Def. Lawyers at 8 ("The reality of the matter is that when a police officer requests a civilian to do something ... it is most often perceived as a command that will be met with an unpleasant response if disobeyed." (quoting *DeHart*, 745 A.2d at 638)).

■ Although arising in the suppression context, the question presented—whether a seizure occurred in the circumstances reflected in the arresting officer's undisputed testimony—is one of law, as to which our review is plenary. *See Commonwealth v. Jones*, 605 Pa. 188, 197–98, 988 A.2d 649, 654 (2010) (discussing the standard of review pertaining to suppression rulings).

■ Upon review, we find that Judge Shogan's dissent reflects the appropriate application of prevailing Fourth Amendment law. As she suggested, Appellee's circumstances as a passenger in a parked car upon the arresting officer's approach were roughly analogous to those in the bus-and-airport-encounter decisions such as *Smith* and *Dowds*.[2] In both lines of cases, the travelers were asked for identification by law enforcement officers, but no seizure was found to have occurred at such juncture. *See Smith*, 575 Pa. at 217, 836 A.2d at 13; *Dowds*, 563 Pa. at 387, 761 A.2d at 1130. *See generally Hiibel*, 542 U.S. at 185, 124 S.Ct. at 2458 ("In the ordinary course a police officer is free to ask a person for

---

**2.** The parked vehicle scenario is to be distinguished from a traffic stop. *See Brendlin v. California*, 551 U.S. 249, 251, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007) (holding that a passenger of a vehicle stopped by police has been subjected to a seizure).

identification without implicating the Fourth Amendment."); *Bostick,* 501 U.S. at 434–35, 111 S.Ct. at 2386 ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification[.]" (internal citations omitted)); *United States v. Hicks,* 2009 WL 3150394, at *4 (E.D.Pa. Sept. 23, 2009) ("A uniformed police officer, who would be expected to carry a gun, may approach a legally parked vehicle and ask the occupants questions without implicating the Fourth Amendment.").[3]

It is thus apparent that, under Fourth Amendment law as reflected in the decisions of the United States Supreme Court, a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter. *Cf. Delgado,* 466 U.S. at 216, 104 S.Ct. at 1762 ("What is apparent from [past decisions] is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation."). The Superior Court majority, therefore, departed from this precedent in attributing such effect to the arresting officer's request along these lines.

We recognize the conceptual difficulties inherent in the administration of the reasonable-person standard. Although the test is cast in objective terms, absent empirical proofs, there remains substantial room for reasonable disagreement concerning how such a hypothetical person might feel in any given set of circumstances. Such differences have been manifested, at both the federal and state level, in many divided opinions on the subject. *See, e.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality); *Mendenhall,* 446 U.S. at 544, 100 S.Ct. at 1870 (plurality); *Commonwealth v. Boswell,* 554 Pa. 275, 721 A.2d 336 (1998) (equally divided Court).[4] Nevertheless, the High Court has

3. In this regard, a request obviously differs from a demand.

4. The contraposition to the prevailing view also has been developed at length in many dissenting opinions in the United States Supreme Court and in this Court. *See, e.g., Bostick,* 501 U.S. at 450, 111 S.Ct. at 2394–95 (Marshall, J., dissenting) (describing an "aura of coercion and intimidation that pervades" police-citizen encounters during drug inter-

settled on an approach allocating very modest weight to the possibility for psychological coercion arising from a fairly wide range of police conduct which may be regarded as being appropriate to and inherent in the circumstances facilitating the interaction. *Cf.* WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 425 (4th ed.2004) (observing that "the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social inter-course[,]" which include moral and instinctive pressures to cooperate).

In the present case, the arresting officer's unrebutted testimony indicates that he did not: activate the emergency lights on his vehicle, *see* N.T., Oct. 4, 2007, at 5, 32; position his vehicle so as to block the car that Appellee was seated in from exiting the parking lot, *see id.* at 22; brandish his weapon; make an intimidating movement or overwhelming show of force, *see id.* at 6, 23, 24; make a threat or a command; or speak in an authoritative tone. *See id.; United States v. Drayton,* 536 U.S. 194, 204, 122 S.Ct. 2105, 2112, 153 L.Ed.2d 242 (2002) ("There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that

diction operations on passenger busses); *Smith,* 575 Pa. at 226–27, 836 A.2d at 19 (Nigro, J., dissenting) (taking the position that "police officers inherently display their authority and are intimidating solely by virtue of their position"); *Dowds,* 563 Pa. at 389–90, 761 A.2d at 1132 (Nigro, J., dissenting) ("From the moment the police approach a person and identify themselves, the average citizen is, in my view, seized because he or she does not feel free to ignore the police officers and go about their business."). *See generally* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard,* 99 J.CRIM. L. & CRIMINOLOGY 51, 87 (2009) (positing that empirical data shows that the Supreme Court has been determining that "people who do not in fact feel free to leave are free to leave"); David T. McTaggart, *Reciprocity on the Streets: Reflections on the Fourth Amendment and the Duty to Cooperate with the Police,* 76 N.Y.U. L.REV. 1233, 1249 (2001) ("Under the 'free to leave' standard, ... the standard of permissible intimidation is quite high.... The inevitable consequence of such a high standard is that many 'reasonable people' will be intimidated by, and submit to, police who lack any suspicion whatsoever, yet their submission will be regarded as consensual, and not as a seizure.").

had this encounter occurred on the street, it would be constitutional.").[5] In terms of the use of the arresting officer's headlights and flashlight, this was in furtherance of the officer's safety, and we conclude it was within the ambit of acceptable, non-escalatory factors. Indeed, as suggested by Judge Shogan, such lighting would appear to create a lesser potential for psychological coercion than the circumstances surrounding systematic drug interdiction efforts at bus terminals and airports. Thus, we do not find this to be the sort of escalatory factor upon which a determination of a seizure may be founded for Fourth Amendment purposes.

We also appreciate that the arresting officer could have informed Appellee that he was free to leave and had the right to refuse the request for identification, which might have ameliorated the potential for perceptions of restraint or coercion. In this area of Fourth Amendment law, however, the United States Supreme Court has eschewed bright-line rules in favor of the totality assessment. *See, e.g., Drayton,* 536 U.S. at 203, 122 S.Ct. at 2112 (finding the Eleven Circuit erred by adopting a *per se* rule that, in the absence of warning passengers that they may refuse cooperate, any evidence obtained during suspicionless drug interdiction efforts aboard buses must be suppressed).[6]

Finally, we realize that this area of the law may be colored by a line of decisions in which the United States Supreme

5. There is also no evidence that the officer retained Appellee's driver's license for longer than necessary to discern Appellee's identity. *See generally People v. Paynter,* 955 P.2d 68, 75 (Colo.1998) (explaining that "the sequence of events that occurs *after* a citizen voluntarily provides an officer his identification, including the length of time that the officer retains the identification card or a request, if any, by a citizen to be left alone or to be permitted to go about his or her business, could result in such a restraint that a citizen is not free to leave." (emphasis in original)). In any event, by the time Appellee retrieved his license from the glove box, the officer had observed the baggies of marijuana, and, therefore, at such juncture, detention was warranted.

6. *Cf. Ohio v. Robinette,* 519 U.S. 33, 39–40, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (rejecting Ohio's *per se* rule that, in the absence of reasonable suspicion of criminal activity separate and apart from the predicate traffic violation, once an initially valid stop is concluded, a police officer must inform the motorist that the legal detention has ended before seeking consent to search).

Court, increasingly, is premising application of the exclusionary rule upon deterrence of police misconduct. *See, e.g., Herring v. United States,* 555 U.S. 135, 144, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."). Such exclusively deterrence-based rationale is in tension with the independent search-and-seizure jurisprudence under Article I, Section 8 of the Pennsylvania Constitution, grounded on privacy interests of the citizenry. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 398, 586 A.2d 887, 899 (1991). It should be apparent from the Court's decisions, however, that all Justices are not of one mind concerning the justification for, limits of, and future course of such jurisprudence. *Cf. Commonwealth v. Russo,* 594 Pa. 119, 133–34, 934 A.2d 1199, 1207–08 (2007) (questioning some of underpinnings of the departure cases). For this reason, in particular, those litigants wishing to advance lines of departure, under Article I, Section 8, from Fourth Amendment doctrine, must bring the matter into sharp focus in their advocacy. *See id.* at 136 n. 11, 934 A.2d at 1209 n. 11 ("We reiterate that we believe that state constitutional decisions are more secure when they are supported by the searching inquiry contemplated by *Edmunds.*").[7]

Pursuant to governing Fourth Amendment law, we hold that the arresting officer's request for identification did not transform his encounter with Appellee into an unconstitutional investigatory detention.

The order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

7. Here, as we read the litigants' briefs, the arguments are tethered to general Fourth Amendment principles.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices EAKIN and McCAFFERY join the opinion.

Justice BAER files a dissenting opinion in which Justice TODD joins.

Justice BAER, dissenting.

The Majority holds that a police officer may solicit the identification of the occupants of a legally parked vehicle without any indicia of reasonable suspicion that there is criminal activity afoot. In my view, while an officer may certainly check on the safety and welfare of occupants of a parked car at night, to solicit identification from those occupants after ensuring all was well constitutes an investigatory detention, which, under the Fourth Amendment to the United States Constitution, requires reasonable suspicion of criminal activity. The Commonwealth has conceded that, at no time relevant to this appeal, did the officer possess reasonable suspicion; yet, the Majority finds the police officer's actions lawful. I respectfully disagree, and therefore dissent.

As noted by the Majority, during the evening of May 31, 2007, Ferguson Township Police Sergeant Ryan Hendrick observed a vehicle parked in the lot of an establishment known as the Dariette. The business had already closed for the day. Sgt. Hendrick pulled his marked cruiser into the parking lot to "merely [check] on the vehicle." Notes of Testimony (N.T.), Oct. 4, 2007 at 21. In so doing, Sgt. Hendrick positioned his cruiser at a 45–degree angle to the parked car, aligning his headlights to illuminate the passenger side. Dressed in full uniform, Sgt. Hendrick then exited his cruiser, and approached the front-passenger door of the car. As he neared the vehicle, the front-passenger window rolled down, and Sgt. Hendrick observed six individuals in the car: two in the front seat, and four in the back. Sgt. Hendrick walked up to the window, and asked the occupants, "What's going on?" *Id.* at 6. One of the individuals in the backseat responded that they

were "Hanging out." *Id.* Noticing that all of the occupants "looked very young to [him]," *id.,* Sgt. Hendrick then asked if everyone in the vehicle was eighteen years' old, to which some of the individuals in the backseat responded that they were not.

At this point, it is noteworthy that Sgt. Hendrick testified that there was no smell of alcohol or drugs emanating from the car, *id.* at 23; nor did he observe any beer cans, indicia of alcohol or drug usage, or, indeed, any signs that there was criminal activity afoot. *Id.* Moreover, no curfew ordinances were in effect at the time of the incident. *Id.* at 38.

Nonetheless, Sgt. Hendrick sought to investigate further, and thus asked the person sitting in the front-passenger seat (later identified as Appellee, John Au), for his identification. Appellee opened the glove compartment to retrieve it, allowing Sgt. Hendrick to observe what he believed to be two baggies of marijuana. After further investigation, Sgt. Hendrick placed Appellee and the driver of the vehicle under arrest for possession of marijuana. Appellee was subsequently charged via summons with possession of a small amount of marijuana. After waiving his right to a preliminary hearing, Appellee filed an omnibus pre-trial motion challenging, *inter alia,* the legality of Sgt. Hendrick's contact and interaction with him and the contemporaneous seizure of the marijuana.

The trial court granted suppression, and an *en banc* panel of the Superior Court affirmed on the Commonwealth's certified appeal. Specifically, the Superior Court determined that while Sgt. Hendrick's initial interaction with the occupants of the vehicle was a mere encounter, as he was only checking on their welfare, the interaction escalated into an investigatory detention upon the solicitation of Appellee's identification. The court so concluded finding that no reasonable person, seated in a car facing a fully uniformed police officer, with "the headlights of a police car shining in his face," and solicited to hand over his identification, "would have felt free to terminate the encounter." *Commonwealth v. Au,* 986 A.2d 864, 867 (Pa.Super.2009) (*en banc* ). For the reasons that follow, I

agree with the conclusion of both the trial court and the Superior Court, and would thus affirm.

Under the Fourth Amendment,[1] mere encounters are found in situations where a reasonable person would feel free to leave, decline to answer questions posed by the officer, or otherwise terminate the interaction with a police officer. *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 889 (2000). The baseline for the distinction between a mere encounter and an investigatory stop begins with the seminal case of *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Such a seizure, of course, must be supported by reasonable suspicion of criminal activity. *Id.* at 21, 88 S.Ct. 1868. It cannot, however, be generalized; for example, the restraint of liberty may not be justified even by the ever-growing, global threat of crime in the large metropolitan areas of this nation. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Moreover, police cannot stop and demand identification from a person without "any specific basis for believing he is involved in criminal activity." *Id.* In essence, a balance must be achieved "between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at 50, 99 S.Ct. 2637 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)). In striking this balance, however, the Supreme Court has been clear that it must "til[t] in favor of freedom from police interference." *Brown*, 443 U.S. at 52, 99 S.Ct. 2637.

1. As the Majority notes, *see* Maj. Op. at 338–39, 42 A.3d at 1008–09, the parties in this case have framed the issue of suppression solely under the Fourth Amendment, and not under Article I, Section 8 of the Pennsylvania Constitution. I agree with the Majority that, to the extent the parties have not focused their advocacy on the privacy-based interests of Article I, Section 8, we should not expand the decision in this case, whatever the outcome, beyond the Fourth Amendment.

The Majority bases its reasoning on drug interdiction cases [2] decided in recent years by the U.S. Supreme Court: "Appellee's circumstances as a passenger in a parked car upon [Sgt. Hendrick's] approach were roughly analogous to those in the bus-and-airport encounter decisions...." Maj. Op. at 337, 42 A.3d at 1007. The Majority then cites these cases, discussed in detail below, for the general proposition that police officers may approach and ask an individual for identification without implicating the protections of the Fourth Amendment. *Id.* (citing, *e.g., Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification.")). In my view, the drug interdiction cases are not "roughly analogous" to the instant appeal; rather, they are completely distinguishable.

In *Bostick,* perhaps the seminal opinion from the U.S. Supreme Court concerning drug interdiction cases, the Court examined a *per se* rule announced by the Florida Supreme Court concluding that when officers boarded a bus for the purpose of conducting a drug interdiction, the passengers were immediately seized for purposes of the Fourth Amendment because of the restricted space within a bus. In that case, during a regularly scheduled stop at a depot, officers boarded the bus for purposes of conducting a drug interdiction, identified themselves and their purpose, and informed the passengers that they were free to refuse to cooperate. The officers then approached each passenger and asked to see their identification and ticketing information. Upon reaching the defendant's seat, the officers asked him for this information. After examining it, the police asked to search the

**2.** In most cases, drug interdiction consists of teams of specially trained officers assigned to "observe and investigate travelers who arrive [at mass transportation centers] from '[drug] source cities.'" *Commonwealth v. Boswell,* 554 Pa. 275, 721 A.2d 336, 338 (1998) (equally divided court). "Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions." *Florida v. Bostick,* 501 U.S. 429, 431, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

defendant's baggage. He consented, and the search revealed marijuana, resulting in the defendant's conviction of multiple charges.

The Florida Supreme Court vacated the conviction, finding that the officers improperly seized the defendant (and, indeed, all the passengers) when they boarded the bus for the interdiction sweep without reasonable suspicion of criminal activity. The United States Supreme Court reversed. First, the Court noted that in most improper seizure cases, the relevant inquiry concerns whether the subject felt "free to leave." *Id.* at 436, 111 S.Ct. 2382 (citing *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). The Court asserted however, that people on a bus generally do not "want to leave." Thus, the Court focused on whether the subject of police scrutiny would have felt free to terminate the encounter or not answer the officer's inquiries, rather than whether he would have felt free to leave the bus. *Id.* at 436–37, 111 S.Ct. 2382. With this standard established, the Court reversed the *per se* rule of the Florida Supreme Court, and remanded to that court for a determination consistent therewith.

The High Court then expounded upon the *Bostick* rule in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), another drug interdiction case involving a person riding on a bus. In *Drayton,* three Tallahassee, Florida police officers boarded a bus at a regularly scheduled stop for the purpose of conducting a drug interdiction sweep. The officers informed the passengers that they were police officers and that they boarded the bus to look for drugs. As one officer positioned himself in the rear of the bus, and the other in the front, the third officer went from passenger to passenger, requesting identification and ticket information, as well as inquiring into any luggage each passenger had on board. Unlike *Bostick,* however, these officers did not inform the passengers that they had a right to refuse to cooperate.

When the officer reached the defendant, he initially inquired regarding the defendant's identification, ticket, and luggage without finding anything suspicious. The officer then noticed that the defendant was wearing baggy, loose fitting clothing,

which he viewed as stereotypical of drug runners. The officer asked if he could search the defendant's person, and upon receiving consent, found almost 300 grams of cocaine duct-taped to the defendant's inner thighs. The defendant was charged with multiple federal crimes,[3] and, prior to trial, he moved to suppress the cocaine on the basis that the officers had improperly seized him without reasonable suspicion of criminal activity. The court granted suppression, finding that the officer's failure to inform the passengers that they could refuse to cooperate elevated the encounters to investigatory detentions unsupported by reasonable suspicion, and the United States Court of Appeals for the Eleventh Circuit affirmed.

On appeal, the Supreme Court reversed on two grounds. First, the Court determined that the lower courts erred in creating a *per se* rule that officers must inform passengers of their right to not cooperate. As in *Bostick,* the Court declined to create a *per se* rule. Rather, it reiterated that in Fourth Amendment cases, an officer's actions must be examined based on the totality of the circumstances, of which the fact that the incident occurred on a bus and that the officer did not inform passengers of their right to refuse to cooperate are part, but not conclusive, of the examination.

Second, in examining the totality of the circumstances, the High Court opined that "[t]he Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." *Id.* at 197, 122 S.Ct. 2105. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id.* at 201, 122 S.Ct. 2105. In finding that the officers in *Drayton* did not improperly seize the defendant, the Court found of great import,

**3.** The *Drayton* decision does not explain why the defendant, who was arrested by Tallahassee city police officers, was charged in federal court.

there was nothing coercive [or] confrontational about the encounter. There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. It is beyond question that had this encounter occurred on the street, it would be constitutional. The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure.

*Id.* at 204, 122 S.Ct. 2105 (internal citations omitted).

This Court then had the opportunity to examine an interaction between drug interdiction agents and passengers in a train station. In *Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994), we found that when four plain-clothed agents approached the defendant and his companion within the confines of a train station because they fit the generalized description of drug couriers, backed them into a wall, and then extensively questioned them concerning their residences and business in the Commonwealth, the officers seized them without reasonable suspicion. Basing the decision solely on the Fourth Amendment, this Court found that under the totality of the circumstances, the officers had curtailed the defendants' liberty, without reasonable suspicion of criminal activity. *Id.* at 623 (citing *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.")).

The appeal *sub judice* is not a bus terminal or train station case, however. Rather, this case concerns six young members of society sitting in a parked car being investigated by a uniform police officer. The very confines of the vehicle, coupled with Sgt. Hendrick's interactions with the occupants, particularly Appellee, in my view distinguish this case from those cited by the Majority. Indeed, while this Court has not had occasion to examine police-citizen encounters with the occupants of parked cars, the Superior Court has, and I

believe its jurisprudence is enlightening and supportive of the rulings of the lower courts in this case to grant suppression.

In *Commonwealth v. DeHart*, 745 A.2d 633 (Pa.Super.2000), after monitoring a radio call describing a "suspicious vehicle," two state troopers observed and followed it to a residential street, where it legally parked. The two occupants of the vehicle then conversed with a man standing on the sidewalk. The state trooper who was driving a marked cruiser, pulled to the side of the subject vehicle, so that his partner in the passenger seat could speak to the driver without anyone exiting their respective cars. Eventually, however, the troopers became suspicious of the activity between the occupants of the car and the man on the sidewalk. They then exited their cruiser, requested that the occupants exit their vehicle and produce identification, and questioned them separately, leading to the discovery of marijuana on the defendant.

In reviewing *DeHart*, the Superior Court reached three holdings pertinent to the appeal before us. First, the court determined that when the troopers pulled alongside the suspicious vehicle and began conversing with its occupants, they did not effectuate a stop, which would have had to be supported by reasonable suspicion, because the car was already parked. Second, the car-to-car conversation was merely that—a conversation—and thus was only a mere encounter. Finally, however, when the troopers exited their cruiser and began to question the defendants separately, they escalated the interaction into an investigative detention, which remained unsupported by reasonable suspicion of criminal activity. *Id.* at 637–38.

Two years later, in *Commonwealth v. Mulholland*, 794 A.2d 398 (Pa.Super.2002), a panel of the court considered a case factually similar to the instant appeal. There, the defendant was seated in his parked van in a vacant parking lot at night. An officer on patrol spotted the van, and pulled into the parking lot to "check to see if everything [was] all right." *Id.* at 399. In doing so, the officer blocked any means of egress, and shined his cruiser's spotlight into the vehicle. He then approached the driver's side of the car, and began to speak

with the defendant, who told the officer that he was fine and was merely waiting for an acquaintance. Nevertheless, the officer continued questioning the defendant. During the conversation, the officer smelled burnt marijuana, and subsequent inquiries eventually led to the discovery of that drug.

The Superior Court properly looked to the totality of the circumstances of the interaction between the police officer and the defendant, and concluded that the officer's conduct amounted to an investigatory detention without reasonable suspicion. Reading the opinion fairly and in the context of the other cases reviewed herein, the officer's initial action of checking on the well-being of the defendant may have been well intentioned and appropriate. However, the manner in which he did so, by blocking the egress out of the parking lot, shining his alley light into the car, and continually interrogating the defendant at night after he provided a reasonable explanation for his presence in the parking lot, led the Superior Court to determine that by the time the officer smelled the burnt marijuana he "had already subjected [defendant] to a period of illegal detention without such reasonable basis for suspicion." *Id.* at 402.

In *Commonwealth v. Johonoson*, 844 A.2d 556 (Pa.Super.2004), a state trooper observed a defendant driving his vehicle

> substantially lower than the speed limit, with his four-way hazard lights flashing. [The defendant] then pulled off the side of the road, without any signal from the [t]rooper. The [t]rooper followed [the defendant] off the side of the road, parked his patrol car, and then activated the lights on his car for safety purposes.

*Id.* at 558–59. As the trooper walked up to the vehicle, he noticed significant damage to it. Subsequent conversation with the defendant revealed overt signs of intoxication, and, field sobriety tests confirmed the same. After his arrest for DUI, the defendant moved to suppress all evidence of his intoxication, arguing that it was obtained during an illegal seizure by the trooper. In support, the defendant contended that by activating his overhead emergency lights the trooper

signaled to the defendant that he was not free to leave the area or terminate the encounter.

The Superior Court disagreed, finding of great significance that the trooper did not activate his emergency lights to effectuate a traffic stop. Not until the defendant voluntarily pulled his vehicle off to the side of the road did the trooper turn on his lights, and only then so that he could safely render aid to a motorist in a damaged vehicle. *Id.* at 562. By moving to the side of the road at 3:00 a.m. after driving slowly with his hazard lights on, the defendant put the police in the position where the only responsible action was for the trooper to pull over and render aid. *Id.* The Court therefore concluded that the officer's assistance to the motorist was a mere encounter, as the motorist was free to decline the officer's offer of assistance.

Finally, in *Commonwealth v. Hill,* 874 A.2d 1214 (Pa.Super.2005), the court sharpened the "mere encounter/investigatory detention" demarcation in motorist-assist, parked car cases. In *Hill,* the defendant was travelling on a rural highway in the dark when a vehicle approached him from behind and flashed its high beams. Thinking the driver of the car wanted to pass him, the defendant pulled his vehicle over to the side and stopped. The following car, which was a marked state police cruiser, pulled in behind the defendant, and the troopers inside activated their emergency lights. Upon exiting their cruiser and approaching the defendant, the troopers observed a strong odor of alcohol and arrested the defendant for DUI.

The defendant moved to suppress the evidence, contending that the troopers improperly seized him when they activated the cruiser's emergency lights. Unlike *Johonoson,* the Superior Court in the *Hill* case determined that an improper seizure had indeed occurred, finding that the defendant

did nothing more than pull his truck to the side of the road in an effort to allow another motorist to pass. Appellee had no reason to expect that a police officer would stop to render aid. Indeed, Appellee testified that when the on-

coming vehicle pulled in behind him, he considered leaving until Trooper Koebley activated his overhead flashing lights. *Hill,* 874 A.2d at 1219. The Superior Court further observed that, during the suppression hearing, the troopers testified that "Once the emergency lights were activated ... [the defendant] would have been required to stay stopped." *Id.* Thus, because the troopers had no reasonable suspicion of criminal activity when they "seized" defendant, suppression of all evidence of DUI was warranted.

These parked car cases demonstrate that general statements, such as, "a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter," Maj. Op. at 339, 42 A.3d at 1007, cannot be a bright line in analyzing a police officer's conduct. Indeed, as the Majority notes, the U.S. Supreme Court has eschewed from bright lines in the context of the Fourth Amendment, *see e.g. Bostick; Drayton, supra* pp. at 332–37, 42 A.3d at 1004–07. Rather, all of the above jurisprudence reveals that courts must examine the totality of the circumstances of the stop. After reviewing the entirety of the record in the case *sub judice,* I agree with the Superior Court that Sgt. Hendrick's solicitation that Appellee produce his identification, coupled with: the way the sergeant positioned his squad car, his use of his cruiser's headlights to illuminate the interior of the vehicle, his being in full uniform with service weapon holstered, interacting with the vehicle's passengers late at night, his positioning himself immediately outside Appellee's door, at least impeding his ability to exit the vehicle, and his prior scrutiny and questioning of Appellee and the remaining occupants of the vehicle, subjected Appellee to an investigatory detention, which was unsupported by reasonable suspicion of criminal activity.

Moreover, while I recognize and acknowledge the *Drayton* line of cases cited by the Majority, they are indeed distinguishable. Sgt. Hendrick did not merely approach Appellee in an airport, bus terminal, or like facility and ask to see his identification, ticket, and luggage. Rather, as noted, at the origin of this incident, the sergeant pulled his marked cruiser into a parking lot at an angle to the car in which Appellee was

seated to position the police officer's headlights so that they would shine directly into the car and at Appellee; exited his cruiser; approached the car in full uniform with holstered gun evident; positioned himself immediately outside Appellee's door; and began to interrogate Appellee and the other occupants of the vehicle regarding their purpose for being in the lot at 12:30 a.m.

I emphasize these facts because they are part of the totality of the circumstances, and not because standing alone they rise to an unconstitutional stop requiring reasonable suspicion. Indeed, a convincing argument can be made that the illumination of the interior of the car and the conspicuous movement of the uniformed police officer toward it were measures appropriate for officer safety. At that juncture, the individuals in the car could have assured the officer of their well-being. The officer having responsibly carried out his duties, and being satisfied that these young people were just "hanging out," could have told them to be careful, wished them well, and sent them on their way. If that is how this scenario would have concluded, there would have been no infringement of Appellee's constitutional rights.

Instead, with no basis or necessity, the sergeant sought Appellee's identification, as he was obviously unsatisfied with the answers he had received to his inquiries to that point. When this solicitation for identification is considered in the context of all the other elements of this interaction, it escalated from a scenario where a reasonable, innocent person in Appellee's position would have felt free to speak or not speak with Sgt. Hendrick, to one in which such person no longer felt free to ignore or refuse the sergeant's solicitation for identification. *Accord Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019, 1021 (1979) (while an officer approaching an individual to ask a question is permissible, when the conduct associated with the approach, however laudable, creates a coercive environment, suppression of any subsequently obtained evidence is proper).

To conclude, the Majority parenthetically observes that "there remains substantial room for reasonable disagreement

concerning how [the reasonable, innocent person] might feel in any given set of circumstances" concerning his right to refuse inquires by an officer. Maj. Op. at 338, 42 A.3d at 1007. While the facts of this case, combined with the aforementioned precedent, certainly exemplify this sentiment, the U.S. Supreme Court has made clear that where a balance is to be achieved "between the public interest and [a citizen's] right to personal security and privacy," such balance must "til[t] in favor of freedom from police interference." *Brown,* 443 U.S. at 52, 99 S.Ct. 2637. Here, Sgt. Hendrick's solicitation of Appellee's identification constituted just that: unlawful police interference with lawful private conduct. As such interference constitutes an investigatory detention unsupported by reasonable suspicion of criminal activity, the Superior Court correctly affirmed the trial court's granting of suppression. As the Majority reaches the opposite result, I respectfully dissent.

Justice TODD joins this dissenting opinion.