J-S14006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| HAROLD COST | : | No. 1567 EDA 2017 |
| | : | |

Appeal from the Order Entered April 20, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009310-2015

BEFORE: OTT, J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY OTT, J.: **FILED JUNE 11, 2018**

The Commonwealth appeals from the order entered April 20, 2017, in the Philadelphia County Court of Common Pleas, which granted Harold Cost's pretrial motion to suppress evidence recovered during an illegal search.[1] On appeal, the Commonwealth contends the trial court erred in categorizing the police interaction with Cost as a seizure, rather than a mere encounter, and, therefore, erred in suppressing a firearm recovered from Cost's backpack. For the reasons below, we reverse the order of the trial court, and remand for further proceedings.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth has properly certified in its notice of appeal that "this order terminates or substantially handicaps the prosecution" pursuant to Pa.R.A.P. 311(d). Notice of Appeal, 5/10/2017.

The trial court summarized the testimony presented during the suppression hearing as follows:

> Police Officer Nigel Agront testified that he was patrolling with [Detective] Kevin Bradley on August 19, 2015 in a high crime area in Philadelphia when his partner saw [Cost] and three other males and suspected "there was something going on back there[.]" The men were in an alleyway designed for automobile traffic with driveways exiting on to it and two of the [men] were later identified to live on that block. The police officers turned their vehicle around, got out at the mouth of the alley, announced "police" and approached the four males from either side of the vehicle. They were wearing plain clothes with visible badges around their neck, and outer carrier and the word "Police" was written across their backs. The police officers asked the men for their identification and they complied. As [Cost] started to remove a backpack from his shoulder, Officer Agront asked if there was something in there that he should know about and [Cost] responded that there was a gun.

Trial Court Opinion, 7/10/2017, at 1-2 (record citations omitted).

Cost was arrested and charged with three firearms offenses.[2] On December 3, 2015, he filed a pretrial motion to suppress the evidence recovered during the search of his backpack. The court conducted a suppression hearing on April 20, 2017, and, at the conclusion of the hearing, granted Cost's motion to suppress. This timely Commonwealth appeal followed.[3]

---

[2] **See** 18 Pa.C.S. §§ 6105 (persons not to possess firearms), 6106 (firearms not to be carried without a license), and 6108 (carrying firearms on public streets in Philadelphia).

[3] The Commonwealth filed a concise statement of errors complained of on appeal on the same day as its notice of appeal. The appeal was initially

- 2 -

J-S14006-18

The Commonwealth's sole claim on appeal is the trial court erred by suppressing the handgun recovered from Cost's backpack as the product of an unlawful seizure.[4]  **See** Commonwealth's Brief at 7.  Our standard of review of a trial court's order granting a defendant's motion to suppress evidence is well established:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted.  The suppression court's findings of fact bind an appellate court if the record supports those findings.  The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

_____

dismissed by this Court when the Commonwealth failed to file a brief.  **See** Order, 11/15/2017.  However, on November 29, 2017, this Court reinstated the appeal after the Commonwealth filed a motion for reconsideration.

[4] We note Cost contends that this claim is waived because it was not preserved in the Commonwealth's Rule 1925(b) concise statement.  **See** Cost's Brief at 15.  We disagree.  The Rule provides, in relevant part, "[e]ach error identified in the Statement will be deemed to include every subsidiary issue contained therein which was raised in the trial court[.]" Pa.R.A.P. 1925(b)(4)(v).  Here, the Commonwealth framed its concise statement as follows:

> Whether the lower court erred in suppress[ing] defendant's gun where police investigating a nighttime shooting in a nearby park approached a group of men and asked if they had anything of which they should be aware; and then asked defendant, who was holding a backpack that he put on the ground, whether he had anything in the backpack of which they should be aware, and defendant said he had a gun in the backpack.

Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b), 5/10/2017.  Although the Commonwealth did not specifically state the court erred in determining Cost was subject to an illegal seizure, that claim was certainly implied.  Therefore, we decline to find the issue waived.

> ***Commonwealth v. Miller***, 2012 PA Super 251, 56 A.3d 1276, 1278-79 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." ***Commonwealth v. Brown***, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

***Commonwealth v. Korn***, 139 A.3d 249, 252-253 (Pa. Super. 2016), *appeal denied*, 159 A.3d 933 (Pa. 2016).

In determining whether a police officer's interaction with a citizen was proper, we must bear in mind the following:

> Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures. Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an "investigative detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.
>
> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. …
>
> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."

This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." Although police may request a person's identification, such individual still maintains "'the right to ignore the police and go about his business.'"

**Commonwealth v. Lyles**, 97 A.3d 298, 302–303 (Pa. 2014) (internal citations omitted).

In the present case, the trial court found the officers' interaction with Cost and his companions "escalated into an investigative detention." Trial Court Opinion, 7/10/2017, at 3. The court provided the following explanation, in *toto*, for its ruling:

[W]hen Officer Agront asked [Cost] about what was in the bag he was carrying, there was no doubt that the stop had escalated into an investigative detention and such a question was designed to potentially incriminate [Cost]. Therefore, as there was no reasonable suspicion of criminal activity, an unconstitutional warrantless search had been conducted and the gun was inadmissible as evidence against [Cost].

**Id.**

The Commonwealth insists, however, the court erred as a matter of law, because the officers' actions herein constituted a mere encounter, in which no seizure of Cost occurred. **See** Commonwealth's Brief at 11-12. Upon our review of the record, the parties' briefs, the relevant case law, we are compelled to agree.

In **Commonwealth v. Au**, 42 A.3d 1002, 1007 (Pa. 2012), the Pennsylvania Supreme Court held that an officer's request for identification

does not escalate a mere encounter into a seizure. In that case, the officer was on routine patrol in the early morning hours when he noticed a car parked in the lot of a closed business. *See id.* at 1003. Because this was "unusual," the officer decided to investigate and positioned his vehicle so that his lights illuminated the passenger side of the parked vehicle. *Id.* He did not activate his emergency lights or block the vehicle's egress. The officer approached the passenger and noticed there were six individuals in the car. He asked "what's going on" and they replied they were "hanging out." *Id.* He then asked them if they were all over the age of 18, at which time the back passengers replied they were not. At that point, the officer asked the passenger for identification, and when the passenger opened the glove box, the officer saw two baggies of marijuana. *See id.* at 1003-1004.

The Supreme Court concluded that the officer's actions did not rise to the level of a seizure of the passenger. *See id.* at 1008. It emphasized the officer did not activate his emergency lights, block the car from leaving, brandish his firearm, make a command or threat, or "make an intimidating movement or show of force." *Id.* Therefore, the Court found the officer's request for identification, alone, was not "the sort of escalatory factor upon which a determination of a seizure may be founded for Fourth Amendment purposes." *Id.*

Later, in *Lyles*, *supra*, the Supreme Court explained the limitation of its holding in *Au*:

*Au* holds that, in assessing the totality of the circumstances, a request for identification does not *in and of itself* elevate what would otherwise be a mere encounter into an investigative detention. *Au*'s limited premise is nothing new—it merely supported and reaffirmed well-settled principles allowing officers to request identification without any level of suspicion, and holding that a request alone does not constitute an investigative detention or seizure. Notwithstanding that general principle, an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal.

That is, *Au* does not [] create a bright-line rule that requests for identification never contribute to a detention analysis. *Au* simply holds there is no opposite bright-line rule that such requests automatically constitute detention. Although cases involving similar or comparable seizure determinations may serve as guideposts, a suppression court must independently employ the totality-of-the-circumstances test in determining whether a seizure occurred.

*Lyles*, *supra*, 97 A.3d at 304–305.

In *Lyles*, the Supreme Court concluded no seizure occurred when two officers approached two men sitting on the steps of a vacant building, and asked them their reason for being there. *See id.* at 300. The defendant stated his grandmother lived on the block, and one of the officers asked for the defendant's identification. While the officer began writing down that information, he noticed the defendant place his hand in his pocket, and turned his body away from the officer's view. The officer told him to take his hand out of his pocket, which the defendant did, but then reached in again. After the defendant ignored the officer's third request, the officer frisked the defendant and recovered drugs. *See id.* In concluding the interaction did

- 7 -

not escalate to a seizure of the defendant, the Supreme Court emphasized, "there is no impropriety in the officers' approaching the men, nor in asking for their reason for loitering there." *Id.* at 305. Moreover, the Court found the officer's request for the defendant's identification, absent a demand or "manifestation of authority," was not *per se* coercive. *Id.* at 306. Accordingly, the Court held the interaction was a mere encounter.

This Court has outlined the following non-exclusive list of factors to consider in determining whether an officer's encounter with a citizen rose to the level of an investigatory detention:

> the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked.

***Commonwealth v. Parker***, 161 A.3d 357, 363 (Pa. Super. 2017) (quotation omitted) (finding evidence recovered during stop should be suppressed when two officers confronted suspect involved in prior drug deal to confirm his identification, and "falsely stated" he was part of a disturbance at a nearby restaurant; court stated, "The presence of two officers, along with [the] suggestion that Appellant was suspected of criminal activity, gave rise to an investigative detention, because a reasonable person in Appellant's positon would not have felt free to leave.").

With this background in mind, we consider the facts of the present case. Officers Agront and Bradley were on routine patrol when they approached Cost

and his three companions as they were exiting the alleyway.[5]  The officers did not activate the lights or siren on their vehicle before they stopped.  **See id.** at 13.  Because they were dressed in plain clothes, the officers identified themselves, but did not direct the men to stop.  **See** N.T., 4/20/2017, at 12, 25.  Although the officers were positioned on either side of the men (because they exited the vehicle from different sides),[6] Officer Agront testified they did not block the men's exit from the alley, and "people were actually walking past us across the sidewalk."  **Id.** at 51.  With regard to the questioning and request for identification, Officer Agront testified the entire encounter lasted "[m]aybe less than a minute[.]"  **Id.** at 47.  He explained:

> [I]t's all, like, a simultaneous thing.
>
>> I'm asking, you know, if you live back there?
>> No.
>> You got ID?
>> Yeah.

---

[5] The Commonwealth insists the officers were on alert after receiving a "radio call for gunshots" in the area.  Commonwealth's Brief at 8.  We decline to rely on that fact in our analysis because the trial court did not rely upon it in its opinion, and it was not uncontradicted.  **See Korn**, **supra**.  Indeed, although Detective Bradley testified that they had received a call for gunshots five to ten minutes before their encounter with Cost, Officer Agront did not recall any radio call.  **See** N.T., 4/20/2007, at 10, 56.  Furthermore, the parties stipulated that there was "no mention of a radio call" in the arrest memo.  **Id.** at 58.

[6] **See** N.T., 4/20/2017, at 31-32.

> You guys – they give us their IDs.
>
> You guys got something on you that I need to know about?
>
> At which point, I don't know if I was running the person or if Officer Bradley was running the IDs. So he could have been running IDs and I could have been asking the questions. You know, anything on you I need to know about? They said no.
>
> Now, I'm watching Mr. Cost take off his backpack. And I say, you have anything in that backpack I need to know about? He said a gun.
>
> So it's – I'm going to say less than a minute.

*Id.* at 47-48. There is no indication in the testimony presented at the suppression hearing that the officers physically restrained Cost or his companions, or presented themselves in a coercive or aggressive manner that "convey[ed] a demand for compliance or [indicated] that there will be tangible consequences from a refusal." *Lyles*, *supra*, 97 A.3d at 354. Indeed, in considering the factors listed in *Parker*, *supra*, we note here while there were two officers involved in the encounter, they were questioning four men. The officers did not inform the men they were suspected of any criminal activity, nor does the record suggest their demeanor or tone of voice was threatening. The officers posed innocuous questions to the men while on a public street, and did not display their weapons. Accordingly, under the totality of the circumstances, we find the incident was a mere encounter.

In his brief, however, Cost emphasizes that the officers: (1) positioned themselves "at the mouth of the alleyway in the 'interview stance'" as they questioned the men; (2) admitted they were acting on pure speculation that there "might be something going on" in the alley; and (3) continued to

question Cost while they "retained control of [his] identification." Cost's Brief at 8, 13. He insists that these additional factors elevated the mere encounter to an investigative detention.

We find, however, Cost has mischaracterized the testimony. First, we note the trial court did **not** make a factual finding that the officers positioned themselves in a way that blocked Cost's travel, or took an "interview stance" which conveyed their authority. While there was testimony regarding this "interview stance" during the hearing, it clearly was not significant to the trial court's ruling, as the court did not even mention it in its opinion.[7] Second, the fact that the officers may have been acting upon pure speculation when they questioned Cost is irrelevant since the incident, at all times, remained a mere encounter. Indeed, even if the officers subjectively believed Cost was not free to leave,[8] so long as that belief was not expressed to Cost, "the

_____

[7] Defense counsel presented several questions to Officer Agront regarding the "interview stance" that the police are trained to take when questioning suspects in the field. N.T., 4/20/2017, at 31. Counsel asked the officer if he was taught, "blade your body, gun away from the person that you receive as your threat when you interview them to talk to them[,]" to which the officer responded, "That's fair." **Id.** As noted above, the court did not even mention the "interview stance" in its opinion, and we fail to see how such body positioning would have conveyed to Cost that he would suffer "tangible consequences" if he refused to answer the officers' questions. **Lyles**, **supra**, 97 A.3d at 304.

[8] However, Officer Agront testified Cost "did not have to answer" his questions, and "did not have to produce the ID," but rather, "[h]e could have walked off at any time." N.T., 4/20/2017, at 35.

officer's subjective views are as immaterial to the objective standard[.]"
***Lyles***, ***supra***, 97 A.3d at 307 n.6.

Finally, Cost makes much of the fact that the officers continued to question him while they retained his identification, and ran a background check. He emphasizes the following language in ***Lyles***:

> Moreover, we do not find the officer's brief recording of the card's information raised the encounter to an investigative detention. Quickly jotting down the information, as opposed to attempting to memorize it, did not restrain appellant's freedom of movement. **The officer did not question appellant further while he was holding the identification, and he did not use appellant's information to run a background check.** He took no additional steps that would suggest detention or restrict appellant's freedom of movement. What delayed this interaction was not the officer's writing but appellant's worrisome refusal to keep his hands in sight.

***Lyles***, ***supra***, 97 A.3d at 306–307 (footnote omitted). Cost insists: "To the contrary, instantly, the officers *did* question Mr. Cost further while holding his identification and they *did* use his information to run a background check." Cost's Brief at 12 (emphasis in original).

We find, however, this dicta in ***Lyles*** is not controlling under the facts of the present case. Here, Officer Agront testified the entire encounter lasted less than one minute. ***See*** N.T., 4/20/2017, at 47. While one officer checked the men's identifications, the other simply asked if they had anything on them the officers needed to know about, and if Cost had anything in his backpack. As noted above, there was no coercive atmosphere or implied demand for compliance "beyond the officers' mere employment." ***Lyles***, ***supra***, 97 A.3d

at 304. Therefore, we find the encounter did not elevate to an investigatory detention and unlawful seizure.

Accordingly, because we conclude the trial court erred in determining the police interaction with Cost constituted a seizure and in suppressing the firearm recovered from his backpack, we reverse the order on appeal.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judge McLaughlin joins this memorandum.

Judge Ransom notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/11/18