J. S27038/15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :   IN THE SUPERIOR COURT OF
:          PENNSYLVANIA
           Appellee   :
:
       v.         :
:
KYRIK GARVIN,          :
:
           Appellant   :   No. 2534 EDA 2014

Appeal from the Judgment of Sentence August 15, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0011410-2013

BEFORE: FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:     **FILED SEPTEMBER 28, 2015**

Appellant, Kyrik Garvin, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following a bench trial and convictions for possession of a controlled substance with the intent to deliver ("PWID"),[1] possession,[2] and false identification to a law enforcement officer.[3] He contends the police lacked reasonable suspicion of criminal activity to seize him and thus the court should have granted his motion to suppress the recovered evidence. We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30).

[2] 35 P.S. § 780-113(a)(16).

[3] 18 Pa.C.S. § 4914.

We adopt the facts set forth by the trial court's opinion:[4]

> On July 31, 2013, 10:45 p.m., Philadelphia Police Officer Sergio Diggs, an experienced narcotics officer and his partner [Officer Marchetti] received a [flash[5]] radio call directing them to go to the 7000 block of Saybrook Avenue, a high crime and drug location, to investigate a report that a group of black males were selling narcotics.
>
> [The flash information was for five black males, which also identified the clothing each wore as follows: (1) a white shirt with writing and shorts; (2) a black t-shirt, dark jeans, and a baseball cap; (3) white bean cap and dark khaki pants; (4) black shirt with writing on the front; and (5) black jeans and a red and black baseball cap. N.T. Suppression Hr'g, 5/28/14, at 17.]
>
> The officers[, who were in a marked vehicle,] immediately proceeded to the . . . block . . . where, upon arrival, Officer Diggs saw a group of three or four males standing on the south side of the block. [Officer Diggs did not see them engage in any criminal behavior. N.T. Suppression Hr'g at 20-21.] Officer Diggs also observed Appellant, who was leaning into a blue Mercury Grand Marquis. [Except for the windshield, that car's windows were heavily tinted. *Id.* at 20.] The males were wearing clothes that match[ed the] information contained in the

---

[4] We acknowledge the holding of *In re L.J.*, 79 A.3d 1073 (Pa. 2013), that after October 30, 2013, the scope of review for a suppression issue is limited to the record available to the suppression court. *Id.* at 1085, 1089 (stating holding applies to "all litigation commenced Commonwealth-wide after the filing of this decision"). Because the instant criminal complaint was filed prior to October 30, 2013, *In re L.J.* does not apply. We further observe the instant record is sparse and less than clear as to when a particular event occurred.

[5] "A flash information is based on a report from the initial officers to investigate the scene of a crime and is broadcast to other police units in the district." *Commonwealth v. Jackson*, 519 A.2d 427, 431 n.3 (Pa. Super. 1986).

[flash] broadcast.[6] As the officers proceeded down the block, Officer Diggs heard someone yell out "Police" after which he saw Appellant hit the car's "lock" button as [Appellant] backed out of the car [on the front passenger side of the vehicle. N.T. Trial, 5/28/14, at 60]. Appellant then walked over to the group of males.

Trial Ct. Op., 1/12/15, at 2-3.

It was as Officer Diggs was stopping two and half car lengths behind Appellant's vehicle that he saw Appellant exit the vehicle, lock the door, and walk to the group of males. N.T. Suppression Hr'g at 21-22. Officer Diggs testified that he turned on the overhead lights and floodlights before he stopped his vehicle behind Appellant's vehicle. *Id.* At this juncture, Officer Diggs still had not seen any of the males or Appellant engage in criminal activity. *Id.*

Officer Diggs continued watching Appellant as he walked toward the males and observed him toss a key to the ground. Officer Diggs [exited his vehicle, retrieved the key, *id.* at 12,] approached the males and [then] asked if any of them resided in the property situated behind where they were standing. All of the males stated that they did not live on that block of Saybrook Avenue[,] at which time Officer Diggs asked them for identification.

Trial Ct. Op. at 2

---

[6] On direct examination, Officer Diggs testified that Appellant matched "the flash and clothes." N.T. Suppression Hr'g at 14. Officer Diggs, however, on cross-examination, testified Appellant was wearing a gray t-shirt, gray shorts, and a gray hat, which he conceded did not match the flash. *Id.* at 18. The flash did not report a vehicle. *Id.* at 25.

In addition to Officer Diggs, the following uniformed officers were present and "hanging out" with the group of black males: Officer Marchetti (Officer Diggs's partner), Officer Kopecki, and Officer Brown.[7]   N.T. Suppression Hr'g at 30.   With respect to "hanging out," the following exchange transpired on cross-examination:

> [Appellant's counsel:] Several uniform police officers surrounding these group of males; correct?
>
> [Officer Diggs:] There were several uniform officers who responded to the call.  I don't know about surrounding.
>
> [Appellant's counsel:] Well, you were there.  None of us were.  Were they standing around these group of males?
>
> [Officer Diggs:] Actually, they were very comfortable.  A few of them didn't get up from sitting[8] on the steps that they were sitting on, and we were talking to them.  Like, it was a few cops and the guys.  I mean, they were hanging out.  Like, they were there.
>
> [Appellant's counsel:] The males because they were already there?
>
> [Officer Diggs:] Right, they were already there.
>
> [Appellant's counsel:] My question to you is, the positioning of the officers who are standing as such—when you go back to the patrol wagon to run the information you receive, those uniformed officers were standing

---

[7] Other than Officer Marchetti, the record does not indicate when the other officers arrived.

[8] We note the record does not establish whether the group of males subsequently sat on the steps or otherwise resolve the testimonial contradiction regarding whether they were standing or sitting.

around where these groups were, as you described, hanging out; correct?

[Officer Diggs:] Right.  We were there.  We got all of their ID's, and that's what we do.  We get the ID's, we run the males, make sure they're not wanted for anything.

[Appellant's counsel:] I know it's what you normally do, but we're only asking about this night in question.  As you go to the patrol wagon, I just wanted to know where the officers were.

[Officer Diggs:] They're still with the males.

N.T. Suppression Hr'g at 30-31.  Officer Diggs testified that none of the men were free to leave at this juncture.  *Id.* at 29.

> Appellant could not produce identification but identified himself as "Rashean Creara" and gave a purported date of birth.  Officer Diggs checked the name and birth date Appellant gave several times through police radio and learned that no such person existed.  Officer Diggs believed that Appellant was attempting to withhold his true identity in order to hide the fact that he may have had open warrants.  Appellant was advised of the results of the records check and that he was going to be detained and taken to a police station so that the officers could learn his true identity.  [It was around this time that the police advised the other men that they were free to leave.  *Id.* at 34.]  Officer Diggs explained [to Appellant] that once a person is subjected to an investigation, it is [a] crime for such person to give the investigating officer a false identification.  In response thereto, Appellant stated that his identification was located in the blue Mercury.

Trial Ct. Op. at 2

Officer Marchetti unlocks the door of Appellant's vehicle,[9] opens the door, looks inside, and says, "There's drugs in the car." N.T. Suppression Hr'g at 10-11, 35, 37. As set forth at the suppression hearing during the direct and cross-examination of Officer Diggs:

> [Officer Diggs:] . . . So Officer Marchetti walked over to the blue Mercury that [Appellant] was observed in when I first pulled into the block. And Officer Marchetti opened the door and he observed—
>
> [Appellant's counsel:] Objection to what he observed.
>
> [Officer Diggs:] Okay.
>
> The court: Don't tell us what he observed, but if he said anything, you're allowed to tell us what he said.
>
> [Officer Diggs:] Officer Marchetti said that there were drugs in the car. . . .
>
> * * *
>
> [Appellant's counsel:] All right. Now after [Appellant's] detained, he then tells you that he has identification in the vehicle; correct?
>
> [Officer Diggs:] Correct.
>
> [Appellant's counsel:] And that's when Officer Marchetti goes over to that vehicle and looks inside; correct?
>
> [Officer Diggs:] Correct.
>
> [Appellant's counsel:] And he actually opened the door to look inside; correct?

---

[9] The record does not reflect when or how Officer Diggs gave his partner the key to Appellant's vehicle.

[Officer Diggs:] Correct.

[Appellant's counsel:] Because he had the keys to the car; correct?

[Officer Diggs:] Correct.

*Id.* at 10-11, 35-36.

Officer Diggs proceeded over to the vehicle and shined his flashlight through its front windshield. Upon doing so, he observed a large, clear Ziploc bag resting on the passenger seat under the center armrest filled with numerous packets of what appeared to be heroin and crack cocaine as well as used and unused packaging. [***Id.*** at 11.]

[Officer Diggs did not recall whether Officer Marchetti shut the door before he used the flashlight to peer through the front windshield. ***Id.*** at 37. Officer Diggs opined that Officer Marchetti may have been standing at the open door when Officer Diggs used his flashlight. ***Id.*** Officer Diggs did not recall whether the vehicle's interior lights activated when Officer Marchetti opened the door. ***Id.***]

Officer Diggs then contacted Southwest detectives and advised them about what he had seen. The detectives arrived at the scene shortly thereafter to execute a search warrant.

A search of the vehicle yielded a Ziploc bag containing various smaller bags containing 5.4 grams of crack cocaine and an amount of heroin as well as numerous packets filled with heroin . . . . [Detective Langan testified that he recovered the bag from under the center console armrest, and that he could see the drugs "in plain view" through the front windshield. N.T. Trial at 63-64, 68. The detective, however, later testified that through the front windshield, he could see only a clear plastic bag but could not see inside it. ***Id.*** at 67.]

Based on the discovery of the bag of drugs, Appellant was placed under arrest . . . .

*See* Trial Ct. Op. at 3-4. No testimony was elicited on whether Appellant's vehicle would be subject to an inventory search.

Appellant filed a pre-trial motion to suppress the narcotics and money seized from Appellant's car, the car key, and a statement made by Appellant. On May 28, 2014, the trial court denied Appellant's motion, and, following Appellant's waiver of a jury trial, found Appellant guilty on all charges. On August 15, 2014, the trial court sentenced Appellant to two to five years' confinement for possession with intent to deliver, and ordered no further penalty for the remaining charges. Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement[10] challenging the denial of his pre-trial motion to suppress.

Appellant raises the following issue:

> Did the suppression court improperly deny [Appellant's] motion to suppress physical evidence and statements where police seized him based solely on an anonymous tip and he did not match any particulars of radio report other than that he was a black male at a particular location?

Appellant's Brief at 2.

Appellant contends the trial court erred by categorizing the initial interaction as a mere encounter. *Id.* at 9. He claims that when the police approached him, they conducted an investigative detention without the requisite reasonable suspicion. *Id.* at 8-9. Appellant asserts the trial court

---

[10] The trial court granted several continuances for Appellant, who was waiting for the completion of the transcripts.

improperly concluded the doctrine of abandonment applied because there was no evidence the police forced or coerced him into discarding the key to his car. *Id.* at 9. The substance of his argument was that the police compelled him to abandon his keys, and he "did not voluntarily abandon his keys, and along with it any expectation of privacy in his vehicle."[11] *Id.* at 18, 21. He argues the trial court erred by invoking the inevitable discovery doctrine "to excuse the police misconduct." *Id.* We hold Appellant is due no relief.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Where the prosecution prevailed in the suppression court, we may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*In re J.E.*, 937 A.2d 421, 425 (Pa. 2007) (citations omitted). In evaluating the legal conclusion drawn by the suppression court, this Court may also consider uncontradicted testimony from the suppression hearing not included in the suppression court's findings of fact. *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119 n.1 (Pa. 1998). It is axiomatic we

---

[11] Notably, Appellant did not argue that alternatively, absent police coercion, by voluntarily dropping his keys, he nonetheless maintained his privacy interest to his vehicle.

cannot reverse on an argument not raised by the appellant.  *See* Pa.R.A.P.

302.  Conversely, however, we can affirm on any basis.  ***Commonwealth v.***

***Clouser***, 998 A.2d 656, 661 n.3 (Pa. Super. 2010)

> Initially we note that Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police.  The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond.  The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.  Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Ellis***, 662 A.2d 1043, 1047 (Pa. 1995) (citations and

footnote omitted).

The Pennsylvania Supreme Court adopted the objective

***Jones/Mendenhall***[12] standard "in determining whether the conduct of the

police amounts to a seizure or whether there is simply a mere encounter

between citizen and police officer."  ***Commonwealth v. Matos***, 672 A.2d

769, 774 (Pa. 1996).

> In [***Commonwealth v. Hicks***, 253 A.2d 276 (Pa. 1969)], this Court adopted the United States Supreme Court's decision in ***Terry v. Ohio***, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), which permits a police officer to effect a precautionary seizure where the police have a reasonable suspicion that criminal activity is afoot.  ***Terry***,

---

[12] ***United States v. Mendenhall***, 446 U.S. 544 (1980); ***Commonwealth v. Jones***, 378 A.2d 835 (Pa. 1977).

and by analogy **Hicks**, recognized that there are some instances in which an individual may not be arrested, but will still be considered to be "seized." In **Jones**, this Court adopted an objective standard[13] for determining what amount of force constitutes the initiation of a **Terry** stop: whether a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes. This case, which preceded the United States Supreme Court's decision in . . . **Mendenhall**, . . . was a precursor to the so-called "**Mendenhall**" test posited by the United States Supreme Court: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."

**Id.** at 773-74 (punctuation and some citations omitted).

The Pennsylvania Supreme Court provided further guidance in applying this "totality of the circumstances" test:

In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

**Commonwealth v. Strickler**, 757 A.2d 884, 890 (Pa. 2000) (footnotes and citations omitted). "The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by

---

[13] Thus, the subjective beliefs of the officer, *e.g.*, a belief that a seizure occurred and the seized individual is not free to leave, "are immaterial to an objective seizure determination." **Commonwealth v. Lyles**, 97 A.3d 298, 302 (Pa. 2014).

physical force or show of coercive authority." ***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014) (citation omitted).

Factors examined in this totality-of-the-circumstances approach include "all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements." ***Mendenhall***, 715 A.2d at 1119. This Court also set forth a non-exclusive list of factors:

> [T]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

***Commonwealth v. Collins***, 950 A.2d 1041, 1047 n.6 (Pa. Super. 2008) (*en banc*) (citation omitted).

With respect to the questions asked by an officer, we acknowledge the following:

> Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. Interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.

***Commonwealth v. Au***, 42 A.3d 1002, 1005 (Pa. 2012) (citation, quotation marks, and alteration omitted).

In *Au*, the following transpired:

> The arresting officer testified that, while on routine patrol in the early morning hours, his attention was drawn to an automobile parked in the lot of a business premises. According to the officer's testimony, it was unusual to see a car in the location at such time, and he decided to make further inquiry. The officer did not activate the emergency lights of his police cruiser, but he positioned his vehicle at an angle relative to the parked automobile so as to illuminate the passenger side. The officer said that he did so without blocking the egress of the vehicle, which he then approached, probably with a flashlight. Further, he explained:

>> As I walk up the passenger rolled down the window. I walked up and just stated what's going on and they stated that they were hanging out. I noticed that there were six individuals in the vehicle, four in the back seat and two in the front-seat. The individuals all looked very young to me, especially those in the back. So I asked if everyone was 18 and the individuals in the back said no.

>> \*    \*    \*

>> Now, at this point I asked the passenger for his identification. He opened the glove box, which was seated right in front of him. When he did there was two baggies of which were clearly marijuana in the glove box direct-in his immediate control. I kept talking to him, requested another officer to come out because of the illegal drugs. I went over to the driver's side opened up the door and asked for his identification as well. When I did that there was also drugs on that side of the vehicle.

*Id.* at 1003-04.

In addressing whether the officer's request for identification elevated a mere encounter to an investigative detention, the *Au* Court observed that the United States Supreme Court

> has settled on an approach allocating very modest weight to the possibility for psychological coercion arising from a fairly wide range of police conduct which may be regarded as being appropriate to and inherent in the circumstances facilitating the interaction. *Cf.* WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.4(a), at 425 (4th ed. 2004) (observing that "the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse[,]" which include moral and instinctive pressures to cooperate).

*Au*, 42 A.3d at 1008.

Accordingly, the *Au* Court held a seizure did not occur:

> In the present case, the arresting officer's unrebutted testimony indicates that he did not: activate the emergency lights on his vehicle . . . ; position his vehicle so as to block the car that [the defendant] was seated in from exiting the parking lot, . . . ; brandish his weapon; make an intimidating movement or overwhelming show of force, . . . ; make a threat or a command; or speak in an authoritative tone. . . . In terms of the use of the arresting officer's headlights and flashlight, this was in furtherance of the officer's safety, and we conclude it was within the ambit of acceptable, non-escalatory factors.

*Id.* (footnote and citations omitted). "[T]he arresting officer's request for identification," our Supreme Court concluded, "did not transform his encounter with [the defendant] into an unconstitutional investigatory detention." *Id.* at 1009. As the *Lyles* Court emphasized, "*Au* holds that, in assessing the totality of the circumstances, a request for identification does not **in and of itself** elevate what would otherwise be a mere encounter into an investigative detention." *Lyles*, 97 A.3d at 304.

Similar to **Au**, the **Lyles** Court ascertained whether a seizure occurred based on the following facts:

> At about 4:30 p.m. on July 11, 2009, two officers on patrol in a marked police vehicle saw [the defendant] and another male sitting on the steps of a vacant building in south Philadelphia. The officers approached the men to question their reason for loitering there, as a large number of burglaries had recently been reported in the area. [The defendant] stated his grandmother lived on the block. One officer asked for [the defendant's] identification, which [the defendant] gave him. When the officer began writing down the identification information, he saw [the defendant] place his hand in his right pocket and turn his right side away from the officer's view; the officer told [the defendant] to stop reaching and remove his hand. [The defendant] again put his hand in his right pocket. Concerned [the defendant] might be reaching for a concealed weapon, the officer instructed him to remove his hand for the second time. When [the defendant] reached into the pocket a third time, the officer placed [the defendant] against the wall of the building to conduct a safety frisk for weapons. [The defendant] once again put his hand in the pocket, so the officer forcibly removed it, and a plastic bag containing blue packets filled with crack cocaine became visible.

**Lyles**, 97 A.3d at 300.

On appeal, the **Lyles** defendant challenged the seizure, arguing that the police conducted an investigative detention:

> [The defendant] asserts a reasonable person would not feel free to terminate the encounter, noting two uniformed officers, with no knowledge of criminal activity in the area on that particular day, approached two young men in daylight, asked for their identity and reason for being there, and then, unsatisfied, commanded [the defendant] to produce identification.

**Id.** at 305 (footnote omitted).

In addressing the defendant's argument, our Supreme Court noted:

> This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. *See Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004) (quoting *INS v. Delgado*, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)) (officer free to ask for identification without implicating Fourth Amendment, and requests for identification do not, by themselves, constitute seizures); *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (citation omitted) (even when officers lack suspicion, no Fourth Amendment violation where they merely approach individuals on street to question them or request identification); *Au*, at 1007–09 (citations omitted) (same); *Commonwealth v. Ickes*, 582 Pa. 561, 873 A.2d 698, 701–02 (2005) (citation omitted) (same). Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." *Bostick*, at 437, 111 S. Ct. 2382. Although police may request a person's identification, such individual still maintains "'the right to ignore the police and go about his business.'"

*Lyles*, 97 A.3d at 303.

> Notwithstanding that general principle, an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal.

*Id.* at 304.

Upon considering the totality of the circumstances, our Supreme Court held the facts established a mere encounter:

The officers knew the area was one where numerous burglaries had occurred, and if not that particular day, at least recently so. Seeing men sitting at a vacant building, there is no impropriety in the officers' approaching the men, nor in asking their reason for loitering there. The officer's request for identification, which came after [the defendant's] response that his grandmother lived on the block, did not indicate "dissatisfaction" with the response—the relevance of this claim being unclear—nor did it objectively imply an intent to detain [the defendant] beyond confirming who he was.

These were permissible acts that do not implicate the Fourth Amendment or Article I, § 8. Therefore, any "escalation" perceived by [the defendant] or by the officer did not render the request objectively unconstitutional. The request was not accompanied by physical restraint, manifestation of authority, or a mandate to comply. The officer simply asked for [the defendant's] identification; he did not demand it or require acquiescence, and [the defendant] gave it to him voluntarily. The officer did not express dissatisfaction with [the defendant's] reply or tell [the defendant] he was not free to leave. There is no evidence [the defendant] was confined or prevented from departing, or that the officer impeded his movement in any way, as the interaction took place on a public street in broad daylight. There was no evidence the officer brandished a weapon or threatened [the defendant] or that the interaction was per se coercive or intimidating. There is no record of the officer displaying an aggressive demeanor or using an authoritative tone suggesting there would be negative consequences if [the defendant] failed to identify himself; he did nothing more than request appellant's identification. Had there been no repetitive furtive conduct by [the defendant], there is no reason to think the encounter would not have terminated promptly once the officer recorded the minimal information he requested.

*Id.* at 305-06 (footnote omitted). Thus, the Pennsylvania Supreme "Court

and the United States Supreme Court have repeatedly held a seizure does

not occur where officers merely approach a person in public and question the individual or request to see identification." *Id.*

In sum, the question of "whether the police needed some level of requisite cause **at the time** they **initially** approached" the defendant is "governed by the type of encounter that the **police initiated** when they approached" the defendant. *In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) (emphases added). The critical inquiry is what type of encounter the police initiated at the time they initially approached the defendant. *See id.* After identifying the type of encounter—*e.g.*, mere encounter, investigative detention, or custodial detention—this Court must then determine whether the police had the requisite cause for that encounter, respectively, *e.g.*, no suspicion required, reasonable suspicion that criminal activity was afoot, or probable cause for an arrest. *See Ellis*, 662 A.2d at 1047; *Jones*, 378 A.2d at 839 n.4.

Instantly, unlike the officer in *Au*, Officer Diggs activated his overhead lights before stopping his vehicle. *Cf. Au*, 42 A.3d at 1008. Similar to *Au*, Officer Diggs, however, stopped behind Appellant's vehicle, did not brandish a weapon, intimidate, or initiate a show of force. *Cf. id.* The officer's use of the floodlights was arguably in furtherance of his safety,[14] as his stop was in

---

[14] The record reflects no reason for activating the floodlights. We also note that Appellant posited the floodlights were pointed at him, *see* Appellant's Brief at 20, but there is no support in the record for this allegation.

a high crime area late at night and prompted by the flash. *See* Trial Ct. Op. at 1-2; *see Collins*, 950 A.2d at 1047 n.6; *cf. Au*, 42 A.3d at 1008. Somewhat comparable to the officers in *Lyles*, who approached two men in an area known for recent burglaries, *see Lyles*, 97 A.3d at 300, Officer Diggs approached the group of males as they matched the flash.[15] *See* Trial Ct. Op. at 1-2. Officer Diggs then asked the group for their identification, which by itself does not establish an investigative detention. *See id.* at 2; *Lyles*, 97 A.3d at 304. At some point during this interaction, two additional officers arrived who were "hanging out"[16] with the group. *See* N.T. Suppression at 30; *Collins*, 950 A.2d at 1047 n.6. The record, however, does not establish whether those additional officers displayed a show of authority or exercised force. *See Mendenhall*, 715 A.2d at 1119. We also acknowledge Officer Diggs heard someone announce "police" as they approached and Appellant tossing his key to the ground.[17] *See* Trial Ct. Op. at 2. Viewing, however, the record in the light most favorable to the Commonwealth and under the totality of the circumstances, we conclude

---

[15] As noted above, we acknowledge the contradicting testimony on whether Appellant matched the flash. *See* n.6, *supra*.

[16] As noted above, neither the Commonwealth nor Appellant illuminated the nature of the "hanging out."

[17] The Commonwealth elicited no testimony qualifying this particular action as, *e.g.*, suspicious, furtive, or otherwise consistent with individuals engaged in criminal activity.

that at this juncture, the police had initiated a mere encounter.[18] *Cf. Lyles*, 97 A.3d at 305-06; *Au*, 42 A.3d at 1008. Although, unlike the facts in *Lyles* and *Au*, Officer Diggs activated the overhead lights and other officers arrived to "hang out," absent additional evidence of a show of authority or exercise of force, we conclude this was initially a mere encounter with respect to Appellant. *Cf. Lyles*, 97 A.3d at 305-06; *Au*, 42 A.3d at 1008. Thus, the police did not require reasonable suspicion. *See In re D.M.*, 781 A.2d at 1164.

Having concluded this was a mere encounter, we next examine whether the police could validly search his vehicle by using Appellant's key. As noted above, Appellant contends he abandoned his key "as a direct result" of the police's investigative detention. *See* Appellant's Brief 18. Therefore, Appellant opines, the trial court erred by concluding he voluntarily abandoned the key. *See id.* We disagree with Appellant.

It is well settled that "[a]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action." *Commonwealth v. Hall*, 380 A.2d 1238, 1241 (Pa. 1977) (quotation marks omitted); *accord Commonwealth v. Byrd*, 987 A.2d 786, 791 (Pa. 2009).

---

[18] Thus, we respectfully disagree with the trial court's determination that the police initiated an investigative detention. *See* Trial Ct. Op. at 5. We may, however, affirm on any basis apparent from the record. *See Clouser*, 998 A.2d at 661 n.3.

In the seminal case of **Commonwealth v. Shoatz**, 366 A.2d 1216 (Pa. 1976), our Supreme Court set forth the following test for ascertaining whether a defendant abandoned property:

> The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of the property he possesses.
>
> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, **but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.**
>
> Moreover, it is well settled that no one has standing to complain of a search or seizure of property that he has voluntarily abandoned. . . .
>
> Although abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action.[19]

**Shoatz**, 366 A.2d at 1219-20 (emphasis added and citations omitted).

> Abandonment can be established where an individual's surrender of possession of the property constitutes such a relinquishment of interest in the property that a

---

[19] Thus, instantly, it was necessary to ascertain the legality of the interaction.

reasonable expectation of privacy may no longer be asserted.

\* \* \*

[T]he mere fact that the property was placed in an area open to the general public is not sufficient to establish abandonment. The evidence must also clearly demonstrate that the [defendant] attempted to dissociate himself from the property.

*Commonwealth v. Johnson*, 636 A.2d 656, 658-59 (Pa. Super. 1994) (citation omitted).

As noted above, Appellant's sole argument was that the police compelled him to abandon his keys. *See* Appellant's Brief at 18. Because we held that the interaction was a lawful mere encounter, no unlawful police coercion occurred that forced Appellant to abandon his keys. *See Johnson*, 636 A.2d at 658-59. As we reiterated *supra*, Appellant did not argue that he did not relinquish his privacy interest in his vehicle by voluntarily abandoned his keys; he argued solely that the police compelled him to abandon his keys. *See generally* Pa.R.A.P. 302 (courts cannot reverse on an argument not raised). Finally, because we have concluded the interaction was lawful, it is unnecessary to ascertain whether the contraband would have inevitably been discovered.[20] *See  Commonwealth v. Gonzalez*, 979

---

[20] We note, however, the Commonwealth failed to adduce any testimony whatsoever regarding, *e.g.*, that the vehicle would have been towed or subjected to an inventory search. *See Commonwealth v. Ingram*, 814 A.2d 264, 272 (Pa. Super. 2002) ("The burden of proving . . . inevitable discovery rests with the prosecution." (citation omitted)).

A.2d 879, 890 (Pa. Super. 2009) (holding inevitable discovery "doctrine provides that evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence."). Accordingly, we affirm the judgment of sentence, albeit on different grounds. *See Clouser*, 998 A.2d at 661 n.3.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/28/2015*